**Affirmed and Memorandum Opinion filed September 24, 2015.**



In The

# Fourteenth Court of Appeals

### NO. 14-15-00389-CV

### IN THE INTEREST OF J.N.G., A CHILD

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-02369J**

### M E M O R A N D U M    O P I N I O N

Appellant P.N.P. appeals the trial court's final decree terminating her parental rights, and appointing the Department of Family and Protective Services (the "Department") as sole managing conservator of J.N.G. ("Jane").[1] In two issues appellant challenges the legal and factual sufficiency of the evidence to support the trial court's findings under sections 161.003 and 161.001(E) of the Texas Family Code. We affirm.

---

[1] Pursuant to Texas Rule of Appellate Procedure 9.8, we will use a fictitious name to refer to the child.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Removal Affidavit

Jane was born to appellant on November 12, 2003. On November 3, 2008, the Department received a report of physical abuse of Jane by appellant. The report stated that appellant was admitted to the Harris County Psychiatric Center after she reported hearing voices telling her to strangle and stab Jane. In the course of the Department's investigation, appellant admitted that before her pregnancy she abused cocaine, marijuana, PCP, and pills. She was admitted to the hospital after she stopped taking her psychiatric medications and was hearing voices. Appellant admitted that she often stops taking the prescribed medication when she begins to feel better. The Department developed a family service plan, and appellant agreed to have supervised contact with Jane, who was living with the maternal grandmother.

On March 18, 2009, appellant phoned the caseworker for Family Based Safety Services and informed him that two days earlier, appellant had been left alone with appellant's brother and Jane, and started hearing voices again telling her to strangle Jane. She started strangling Jane, but stopped. The maternal grandmother reported that she had taught Jane that if appellant began to hurt her, Jane was to say, "Mommy stop, I love you mommy in Jesus['] name." The grandmother reported that Jane remembered the words, and that is why appellant stopped strangling Jane.

On March 19, 2009, the Department was granted temporary managing conservatorship of Jane due to physical abuse, appellant's inability to be compliant with psychiatric medication, and the maternal grandmother's violation of the safety plan by leaving Jane alone with appellant and appellant's brother, which resulted in the attempted strangulation of Jane by appellant.

Jane was placed in a foster home on December 31, 2009, and remained there until the filing of the petition in this suit. In June 2010, Jane requested that visits with appellant stop. Jane's therapist recommended that Jane have no contact with appellant.

On April 17, 2013, the Department filed an original petition for protection of Jane and termination of both parents' parental rights.[2] The Department filed an amended petition on June 4, 2013, in which it alleged that termination of appellant's rights was warranted because appellant:

> knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child, pursuant to §161.001(l)(D), Texas Family Code;

> engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child, pursuant to §161.001(l)(E), Texas Family Code;

> executed an unrevoked or irrevocable affidavit of relinquishment of parental rights as provided by Chapter 161, Texas Family Code; and/or

> failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child, pursuant to §161.001(1)(O), Texas Family Code.

> Additionally, has a mental or emotional illness or a mental deficiency that renders the mother unable to provide for the physical, emotional, and mental needs of the child and will continue to render the mother unable to provide for the child's needs until the 18th birthday of the child, despite at least six months of reasonable efforts to return the child to the parent. [*See* Tex. Fam. Code Ann. § 161.003.]

---

[2] The child's father has not appealed the termination of his parental rights.

**B. Trial Testimony**

At trial before a jury, Charlotte Donner, the clinical supervisor for the Children's Crisis Care Center, testified that she conducted an interview with appellant in 2009 in which appellant acknowledged that she heard voices telling her to kill her daughter and she felt compelled to harm Jane. Appellant expressed regret when talking about harming Jane. Appellant reported diagnoses of bipolar disorder and schizophrenia, and "having two years of pretty pervasive mental health issues where she was repeatedly hospitalized on psychotropic medications." Appellant reported substance abuse that began at age 15 after a traumatic life event, which appellant reported was sexual abuse. During the interview, appellant reported hearing voices telling her to kill Donner. Donner ended the interview, called her supervisor, and asked appellant to step into the waiting area. While in the waiting area, appellant pushed a bookshelf to the ground.

Donner described bipolar disorder as "a mood disorder where a person has difficulty, at times feeling very euphoric and may lose, in extreme cases, touch with reality[.]" She described schizophrenia as a "pervasive mental illness where a person loses, at times, touch with reality where they can't ascertain what is real and what is imaginary. It often affects their functioning, their ability to have relationships with people because they can't perceive things accurately." Donner also explained that individuals with schizophrenia often suffer hallucinations and delusions. Appellant experienced "command auditory hallucinations" in which she heard voices telling her to harm her child. With both disorders it is common for patients to have difficulty complying with medications because the medications have unpleasant side effects, which cause the patient to stop taking them when she feels better and thinks she no longer needs medication.

Appellant testified that Jane's father was her former drug supplier. Appellant

4

reported that in 2007, she had reported hearing voices tell her to harm herself. Before Jane's birth, appellant reported using marijuana, cocaine, and PCP. Appellant learned she was pregnant after going to the hospital. Appellant first testified that she went to the hospital for a panic attack. She later testified that she had used marijuana and cocaine prior to going to the hospital and had reported to Donner that she was in the hospital due to a drug overdose. She testified that she stopped using illegal drugs as soon as she learned she was pregnant.

After the episode with Donner, appellant was admitted into the Harris County Psychiatric Center. Appellant entered into a safety plan in which Jane would live with appellant's mother, and appellant would not have unsupervised contact with Jane. The plan also prohibited appellant's brother from having contact with Jane due to his record of drug possession. After entering into the safety plan, appellant was left at home with her daughter and her brother. She heard voices telling her to harm her daughter. When Jane responded, "Momma, no. Pray," appellant "burst out in tears" and tried to tell her brother, but he was asleep. When appellant's father arrived, she asked him to drive her to see her psychiatrist.

Appellant testified that she had been compliant with her psychiatric medications since 2010, she completed a parenting class, and she attends regular group meetings to address her bipolar issues. Since 2007, appellant has been admitted to psychiatric facilities between five and seven times. She saw Dr. Harris Houser in 2012, and she reported to him that she had good days and bad days and sometimes heard voices.

Dr. Amanda Norris conducted a psychological evaluation of appellant on June 16, 2009. Norris testified that appellant reported frequent auditory hallucinations and suicidal thoughts. Appellant reported that as a child, she was beaten by her brother and received spankings from her parents that sometimes left

5

bruises. Appellant reported being sexually abused by a male when she was 15 years old, and at the same age, her brother, on multiple occasions, arranged for her to have sexual intercourse with a 17-year-old neighbor. Appellant reported experiencing flashbacks of the mistreatment by her brother. Appellant reported that she began using marijuana at 18, and cocaine and PCP at 23. Appellant reported that one week before the evaluation she wanted to commit suicide by cutting her wrists or by suffocating herself. Norris diagnosed appellant with schizoaffective disorder, bipolar type, which she described as a type of schizophrenia where a person also has a mood disorder. Norris also diagnosed appellant with personality disorder, not otherwise specified. Norris's report indicated that appellant displayed traits of avoidance, borderline negativistic, schizotypal, antisocial, paranoid, and masochistic behavior. At the time of the evaluation, appellant's functioning was characterized by or impaired by significant hallucinations.

The Department asked Dr. Paul Damin to conduct a psychological evaluation of appellant in 2013. Damin's evaluation reflected that appellant had some issues with distress, rigidity in her parenting strategies, and general unhappiness in her life. Another test revealed appellant does not understand child development very well and may have difficulty with understanding the empathic needs of children, which Damin described as the inability to understand, comfort, or nurture a child in a way that helps the child grow emotionally as opposed to feeling dismissed or rejected. Damin gave appellant a global functioning score of 55 on a scale of one to 100, which reflects a moderate degree of concern in relation to disruption in her life from mental illness. Based on Damin's interpretation of the tests he administered to appellant, Damin opined that appellant's responses to the tests represent significant and serious risk to children in her care.

Sarah Austin with Child Advocates testified that she has maintained a

relationship with Jane since May 2010.[3] Austin conducted a home study on appellant's parents to determine if their home was an appropriate placement for Jane. Austin reported that the home was rejected as an appropriate placement because appellant's parents never addressed appellant's abuse by her brother despite being informed of the abuse. Also, appellant's mother failed to follow the service plan, and left appellant alone with Jane and appellant's brother the second time appellant attempted to strangle Jane. Austin testified that appellant does not appear to understand the danger she placed her child in or the trauma she subjected her child to by attempting to strangle her. Austin testified this was particularly concerning because appellant maintained this misunderstanding despite being compliant with her psychiatric medication and free from illegal drug use.

When Austin first met Jane, she was very timid; she would put her hand over her face and talk into her elbow when asked about her family. After the first year in foster care, Jane began to speak more freely and stopped putting her hand over her face. When Austin would ask Jane about her mother and whether she wanted to visit her mother, Jane would start to shake uncontrollably and cry. She would also wet the bed for a "couple of nights" after having that conversation. Austin described Jane as "very, very happy" in her current foster home; Jane interacts with other children in the home, is having no trouble in school, and is participating in extracurricular activities.

In 2013, Jane's foster mother sought counseling services so that Jane could process her feelings about her mother. Yarinika Miller is a psychologist who was contracted to see Jane after the foster mother sought counseling. As part of her therapy, Jane wrote a letter in which she expressed happiness with the foster family

---

[3] Austin maintained a continuing relationship for four out of the five years. For one year, Austin experienced health problems and was hospitalized. After recovering, Austin renewed her relationship with Jane.

7

and distrust for her mother. Miller ended therapy in 2014 because Jane was not exhibiting any behavior problems and Miller noticed that Jane was becoming frustrated with addressing issues regarding her mother. Miller reported that Jane said "she was kind of tired of the counseling and addressing issues regarding her mother because she wasn't changing her mind." Miller expressed the opinion that Jane was happy, stable, and loved her foster family.

Joanna Fisher, the Department caseworker, has been Jane's caseworker since August 2, 2012. In the original family service plan filed May 20, 2013, appellant was required to:

- maintain safe and stable housing;

- complete psychiatric and psychological evaluations;

- continue to take prescribed medication;

- contact the caseworker at least twice a month to discuss progress made on the recommended tasks outlined in the service plan;

- participate in an eight-week parenting class;

- complete a drug and alcohol assessment;

- maintain stable income;

- participate in individual counseling;

- submit to random drug screenings;

- attend all scheduled court hearings, permanency conferences, scheduled visitations, and meetings requested by the Department or the court; and

- participate in services through the Mental Health and Mental Retardation Association (MHMRA) for additional support for her mental health needs.

Fisher testified that appellant completed most of the requirements in the service plan. Appellant was not qualified for MHMRA, but obtained psychiatric services through Ben Taub Hospital. Appellant has not demonstrated that she learned

8

parenting skills through parenting classes.

Kisa Williams testified on appellant's behalf. Williams was Jane's foster mother in 2009 when Jane was five and six years old. Williams testified that Jane was excited to see her mother when appellant visited.

Jane was placed with Ramona Barlow, appellant's second cousin, from June to November 2009 when she was five years old. Barlow testified that Jane enjoyed visits with her mother and grandmother.

Jane's current foster mother testified that Jane came to her home in December 2009. When Jane came to the foster home she was a fearful child, frequently had nightmares, and wet the bed. Appellant's visits with Jane were stopped in the summer of 2010. After the visits stopped, Jane no longer had nightmares and wet the bed less frequently. Jane is in the fifth grade in school, and doing well in all subjects except math. The foster mother has engaged a tutor to help Jane with math. Jane plays softball and participates in cheerleading and tae kwon do. She has many friends and treats the foster mother's other children as her siblings.

### C. Jury Charge and Verdict

The jury charge submitted grounds for termination under Texas Family Code sections 161.001(1)(E) (endangerment), (N) (constructive abandonment), and (O) (failure to comply with the service plan). *See* Tex. Fam. Code Ann. § 161.001(1)(E), (N), (O) (West 2014). The charge also listed the ground under section 161.003 of the Family Code, which permits termination if the parent has a mental illness that renders the parent unable to provide for the physical, emotional, and mental needs of the child. Additionally, the jury was instructed: "[I]t also must be proved by clear and convincing evidence that termination of the parental rights

would be in the child's best interest."

The charge included these instructions:

In determining whether a parent " . . . engaged in conduct which endangers the physical or emotional well being of the child . . ." and/or in, determining whether the parent " . . . knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child . . ." you may include, but are not limited to, the following in your deliberations:

"Endanger" means to expose to loss, injury, risk or detriment, to place in jeopardy or danger. The child need not witness, observe or be present during the endangering conduct. Although "endanger" means more than the threat of abstract injury or the possible side effects of a less than ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury.

Abusive, violent, aggressive or detrimental behavior by a parent or a person who has access to the child that endangers the physical or emotional well being of a parent, the child or another person can be construed as endangering the physical and emotional well being of the child.

Evidence of conduct, whether leading to imprisonment or not, that indicates or displays a voluntary, deliberate and conscious course of conduct detrimental to the stability of the family or child including, but not limited to failure to plan for an adequate and stable home, adequate and stable parental care, adequate and stable emotional support, adequate, stable and sufficient economic support, adequate and safe surroundings, adequate and stable educational opportunities for the child, and failing to provide a reasonable and sincere effort to establish a positive, nurturing, stable, safe and constructive relationship with the child, will support termination of parental rights on the theory that such conduct endangers the physical or emotional well-being of the child.

A parent who, by commission or omission, exposes the child to or fails to protect the child from a risk of physical injury or emotional harm engages in conduct that endangers the child. The parent's knowledge of the possible consequences of their course of conduct implies a conscious disregard and indifference to the parent's rights,

10

duties and responsibilities and is conduct that endangers the child. A parent is responsible for the conduct of another person if the parent solicits, encourages, directs, aids, or attempts to aid a person that is engaging in endangering conduct with the child or if the parent acquiesces to such endangering conduct and does not take immediate positive steps to protect the child from the endangering conduct.

While mere presence alone by a parent is not proof positive of endangering conduct, presence is a circumstance tending to prove a parent engaged in endangering conduct when presence is combined with other facts that show the party, by acts of commission and/or omission knew or should have known that the conduct of another person was endangering conduct and/or the parent failed to protect a child from or actually engaged in or furthered the endangering conduct toward the child.

Based on these instructions, the jury was asked whether the parent-child relationship between appellant and Jane should be terminated. The jury answered "yes."

The trial court signed a decree of termination finding that appellant's parental rights should be terminated based on the predicate findings under Family Code sections 161.001(1)(E) and 161.003, and that termination of appellant's rights was in the best interest of the child.

## II. ANALYSIS

In her second issue appellant argues the evidence was legally and factually insufficient to support the jury's finding under section 161.001(1)(E) of the Texas Family Code. Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Family Code; and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Appellant does not challenge the trial court's finding that termination is in the best interest of the child.

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d at 336. We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

In reviewing the factual sufficiency of the evidence, we consider and weigh

all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). In this context, endanger means "to expose to loss or injury; to jeopardize." *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (quoting *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam)). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d at 477.

Termination under subsection 161.001(1)(E) must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent. *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re T.N.*, 180 S.W.3d at 383; *see also In re*

13

*J.O.A.*, 283 S.W.3d at 336 (holding that endangering conduct is not limited to actions directed toward the child). Danger to the child's well-being may be inferred from parental misconduct alone, and courts may look at parental conduct both before and after the child's birth. *Id.* ("[T]he endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage."). The conduct need not occur in the child's presence, and it may occur "both before and after the child has been removed by the Department." *Walker v. Tex. Dep't of Family & Protective Servs*., 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

As a general rule, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re J.O.A*., 283 S.W.3d at 345. Mental illness or incompetence of a parent alone are not grounds for terminating the parent-child relationship; however, if a parent's mental state causes her to engage in conduct that endangers the physical or emotional well-being of a child, that conduct can support a termination ruling under subsection (E). *In re T.G.R.-M.*, 404 S.W.3d 7, 14 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *In re J.I.T.P*., 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). A parent's mental instability and attempt to injure the child may contribute to a finding that the parent engaged in a course of conduct that endangered a child's physical or emotional well-being. *In re T.G.R.-M.*, 404 S.W.3d at 14.

Appellant argues that the evidence does not demonstrate she engaged in a voluntary, deliberate and conscious course of action that endangered Jane. She admits she attempted to strangle Jane, but argues her conduct was not voluntary because she suffers from schizophrenia and bipolar disorder. Appellant argues that her mental illness prevented her from committing those acts knowingly,

14

deliberately and consciously. Scienter, however, is not required for appellant's own acts under § 161.001(b)(E); scienter is required only under subsection (D) when a parent places her child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Appellant cites *In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012), for the proposition that the Department bears the burden of establishing that the endangering conduct was part of a voluntary course of conduct that endangered the child's well-being. This statement in *E.N.C.*, however, was made in relation to the court's consideration of a prior conviction as a factor in its analysis of whether the appellant engaged in conduct that endangered the child. *Id.* Specifically, in *E.N.C.*, the court held that, "the Department bears the burden of showing how the *offense* was part of a voluntary course of conduct endangering the children's well-being[.]" *Id.* (emphasis added). The supreme court did not add a requirement of scienter into the Department's burden under subsection (E).

The jury heard evidence that on multiple occasions, appellant heard voices that told her to strangle Jane. In March 2009, appellant began strangling Jane and did not stop until Jane said, "Momma, no. Pray." Appellant admitted attempting to strangle Jane due to auditory hallucinations. Appellant reported diagnoses of bipolar disorder and schizophrenia, and also reported that she occasionally stopped taking medication for these illnesses because she did not think it was helping her. Appellant admitted she was not taking the medication when she attempted to kill her daughter. Even when appellant was taking the medication regularly, she did not appear to understand the detrimental effect the attempted strangulation had on her daughter.

The jury also heard evidence that appellant neglected to perform appropriate actions to support and protect her child emotionally. Austin, the Child Advocates'

representative, testified that she observed appellant when Jane tried to put her arm around appellant. Austin described appellant's response as "disturbing." When asked to elaborate, Austin described appellant's response as "frightening; startled; like a startled frightened glare of nonrecognition of who [Jane] was and being surprised that she was even there[.]" Austin also testified regarding Jane's negative emotional responses when asked about visiting her mother. In addition, the jury heard Damin's opinion regarding appellant's inability to nurture a child emotionally, evidence that Jane's therapist recommended no contact with appellant, and evidence from Jane's current foster mother contrasting Jane's emotional state before and after Jane's visits with appellant stopped.

Reviewing the evidence under the appropriate standards, we conclude that the jury could have formed a firm belief or conviction that termination of the appellant's parental rights is warranted under section 161.001(1)(E). We overrule the appellant's second issue.

Concluding that the evidence is legally and factually sufficient to support the jury's finding of endangerment under section 161.001(1)(E) of the Texas Family Code, we need not discuss appellant's issue challenging the jury's finding under section 161.003. Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Appellant does not challenge the jury's finding that termination was in the child's best interest. Therefore, the evidence is legally and factually sufficient to support the termination of appellant's parental rights.

We affirm the trial court's judgment.


/s/    William J. Boyce
        Justice


Panel consists of Justices Boyce, Busby, and Brown.

17